IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs February 25, 2020

**STATE OF TENNESSEE v. MARK STEVEN TREUCHET**

**Appeal from the Circuit Court for Bradley County**
**No. 17-CR-002     Sandra N. C. Donaghy, Judge**

_____

**No. E2019-00663-CCA-R3-CD**

_____

The Defendant, Mark Steven Treuchet, was convicted after a jury trial of second degree murder, a Class A felony, and sentenced to seventeen years, six months' incarceration. See Tenn. Code Ann. § 39-13-210. In this appeal as of right, the Defendant contends that (1) the trial court erred by denying his motion to disqualify the district attorney's office; (2) the evidence was insufficient to sustain his conviction; (3) the court erred by excluding police testimony regarding the victim's state of mind; (4) the court erred by admitting a portion of the Defendant's police statement referring to a prior bad act; and (5) the court erred by giving a jury instruction on transferred intent and by declining to give jury instructions on private arrest and defense of a business. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard H. Hughes, District Public Defender, and Donald Leon Shahan, Jr., Assistant Public Defender, for the appellant, Mark Steven Treuchet.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; and Coty Wamp, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arises from the September 8, 2016 shooting death of Jeremy Lane Headley at the Bradley County, Tennessee landfill. The January 2017 term of the Bradley County

Grand Jury charged the Defendant with premeditated first degree murder. See Tenn. Code Ann. § 39-13-202(a)(1).

An aerial photograph of the landfill reflected that it was comprised of a large dirt area, several buildings, and a "scalehouse"; a large wooded area bordered the landfill on one side. The landfill was operated by Santek and its employees, and construction work in the landfill was performed by an independent contractor, Wright Brothers, for whom the Defendant and other employees worked.

Relative to the landfill's accessibility to the public, employee Kermit George Parker testified that the landfill had two gates; he stated that although the gates were not open to the public, the public could enter either gate. Mr. Parker explained that the landfill was county property and that anyone was "welcome to come in[.]" Landfill manager Chris Parker[1] stated that it was common for employees to approach a "trespasser" and find out what the person was doing on the property; alternatively, employees could call Chris to report the trespasser.

The evidence at trial reflected that on September 8, 2016, the victim was riding in a car driven by another person in Meigs County, Tennessee. During a traffic stop, the driver fled with the victim in the car, and a lengthy police chase spanning multiple counties ensued. Eventually, Bradley County Sheriff's deputies forced the car to a stop near a wooded area adjacent to the Bradley County landfill. The victim escaped into the woods, and a manhunt ensued.

Bradley County Sheriff's Deputy Cody Bell testified that a K-9 search indicated that the victim was traveling toward the landfill. Deputy Bell received information that the victim was possibly armed "with a pistol or a long gun" and facilitated the landfill's evacuation and lockdown. He affirmed that the police were concerned about the landfill employees' safety and that the special weapons and tactics (SWAT) team, which carried M-16 machine guns, responded to the scene.

The landfill employees gathered at picnic tables near the front office for about three hours while the area was searched. Santek employee Lawrence Allen Earwood and his wife Kelli Branam, Wright Brothers employee Karen Lynch, Mr. Parker, and Chris all testified regarding the Defendant's statements during the lockdown.

Mr. Parker testified that while the employees were "talking smack," he heard the Defendant speak about his previous military career and state, "[If] I see the son of a gun I'll shoot him myself." Chris heard the Defendant say that if the fugitive came back to the

---

[1] Because George Parker and Chris Parker share a surname, for clarity, we will refer to Chris Parker by his first name. We intend no disrespect.

area, the police would not "have to worry about it. [He would] take care of it, something to that [e]ffect." Ms. Lynch heard the Defendant say, "I've got my pistol. I'll shoot that mother f---er."

Mr. Earwood, who was standing apart from the other employees with Ms. Branam, overheard the Defendant's making a telephone call, during which the Defendant stated that a fugitive was "running loose" and that if he saw the man, he was "gonna do what the cops [could not] do." The Defendant further stated that he would shoot the man if the police could not do it. Ms. Branam heard the Defendant "talking about the boy that was on the run, said that he was gonna do what the cops couldn't do. He was gonna kill him." Ms. Branam noted that the Defendant "was making a lot of noise and . . . he got really loud."

Ms. Branam denied that she and Mr. Earwood were present for any other conversation. However, Mr. Earwood stated that he later joined the employees at the picnic tables and heard the Defendant state again that he was going to "do what the cops couldn't do, he would do it for them" and shoot the man.

Mr. Parker, Ms. Lynch, and Chris all noted that such boasting and language were common among the landfill employees, who were generally described as "working people." Mr. Parker commented, "[Y]ou couldn't blame nobody [sic] for saying, you know -- . . . because what they were looking for was Al Capone, you know what I mean? . . . I mean, and he done jumped [sic] out of the car down there and he's ready for battle, you know." Chris characterized the Defendant's statements as "[p]eople, you know, just running their mouths . . . just to be talking, to be heard."

Ms. Lynch added that the Defendant "kept pulling the side of his shirt up showing his pistol, saying that he had his pistol and he'd shoot him," and that relative to ammunition, the Defendant mentioned "something about cop killers[.]" Although Mr. Earwood could not discern whether the Defendant was carrying a gun, he stated that "it kind-a' looked like in the side there was something showing." Mr. Parker denied that the Defendant displayed a gun at the picnic area.

Quality assurance technician Kyle Branning, Wright Brothers employee Brian Jones, and Wright Brothers foreman James Manis testified that they were also present at the picnic area, but they did not recall any particular statements the Defendant made during that time.

Relative to the atmosphere in the landfill during the lockdown, Chris testified that both he and his employees were concerned and that some of the employees were afraid. Mr. Parker stated that he was told "they had an armed and dangerous criminal running around." Chris and Mr. Manis testified that law enforcement told them that the fugitive had "a long gun and a pistol." Mr. Branning stated that he heard "through the grapevine,"

not from a police officer, that the fugitive was armed. Mr. Jones and Mr. Earwood were also told that the fugitive was armed and dangerous. Mr. Manis added that the site superintendent told him that two suspects were missing.

Mr. Parker, Mr. Branning, and Mr. Manis testified that the SWAT team was present at the landfill; Chris discussed seeing police in "tactical gear"; Mr. Jones stated that "a lot" of police officers, some of whom wore vests, were present; and multiple witnesses observed a police helicopter searching the area. Mr. Parker estimated that "sixty" police officers searched the landfill. Mr. Branning stated that more than twenty officers were present and that he thought "[s]omething bad" was happening; he was told that the police were looking for "[s]ome guy on the run apparently for drug charges."

Deputy Bell testified that after a few hours, the manhunt was discontinued when another Bradley County Sheriff's deputy saw the victim and determined that the victim was unarmed, barefoot, and not wearing a shirt. However, Deputy Bell did not relay to the landfill employees that the victim was unarmed. Mr. Parker, Mr. Branning, and Mr. Jones all testified that when they were cleared to return to work, they were under the impression that the fugitive had not been located and that he was still possibly armed. Chris stated that he did not know whether the fugitive was armed. Multiple witnesses stated that they were uncomfortable about being asked to return to work.

Ms. Lynch initially testified that at the time, she did not know whether the fugitive had been located; however, she acknowledged her statement to the Tennessee Bureau of Investigation (TBI) that the fugitive had not been found when she returned to work. Ms. Lynch also recalled an unidentified person's saying that the fugitive had "thr[own] the rifle down or something." Moreover, Mr. Earwood testified that a police officer and Chris told him the fugitive was unarmed. Mr. Earwood stated that Chris conveyed that it was safe to return to work and that the police had "picked the weapon up from the other guy[.]" Mr. Earwood agreed that if Chris testified at trial that he did not know whether the fugitive was armed, it was a misstatement.

Chris testified that after the landfill employees were released, he spoke to Mr. Branning and cautioned him to "keep [his] eye out" because Mr. Branning was "a young guy." Chris noted that he also stopped briefly and spoke to the Defendant, who was working on a bulldozer, about a work-related question. Chris then drove to the "south bar area," where he saw police in a subdivision adjacent to the south side of the landfill property. Meanwhile, Ms. Lynch and Mr. Manis went to a nearby gas station together to buy drinks. Mr. Parker, Mr. Branning, Mr. Jones, and Mr. Earwood returned to their respective work spaces.

Mr. Parker testified that he worked alone in the machine shop, which had no windows. Mr. Parker stated that he could not see a person approaching, and he mentioned

multiple times that he worked underneath heavy equipment. Mr. Earwood testified that the employees typically clocked out for the day at the machine shop.

Thereafter, it was undisputed that the Defendant encountered the victim and shot him. Mr. Jones, Mr. Branning, and Chris all witnessed the shooting and testified about their respective observations.

Mr. Jones was operating an excavator when he saw the victim walking along the road. The victim walked past Mr. Jones, waved, and continued walking. Mr. Jones also saw the Defendant following the victim in a bulldozer about thirty or forty yards behind the victim. Mr. Jones called Mr. Manis, who was his supervisor, and relayed his observations of the scene. As the Defendant passed Mr. Jones, he looked at Mr. Jones and "kind of shrugged" before continuing.

Mr. Jones testified that he turned the excavator around and that when he regained sight of the Defendant, he "was on the ground confronting" the victim. Mr. Jones estimated that he was between eighty and one hundred yards from the Defendant and the victim. Mr. Jones stated that the victim ran "down the hill a little, and back up, and then . . . down."[2] Mr. Jones clarified that the victim and the Defendant initially faced each other and that the victim ran away from the Defendant and in the direction of the machine shop. Mr. Jones did not see a gun or hear any shots; however, he saw the victim fall to the ground after running about twenty yards toward the machine shop.

Mr. Jones acknowledged his statement to the TBI that he saw the victim "running down the slope" toward the machine shop. He also told the TBI that the victim "ran up the hill. It looked like he was trying to jump over a fence." Mr. Jones explained that a fence to prevent erosion ran along the road on which the victim was walking. Mr. Jones denied that the victim ran back toward him and the Defendant; he agreed that the victim was "zig-zagging" and "acting erratically."

Mr. Branning testified that he was walking in the vicinity of the machine shop when he saw the victim, who was one or two hundred yards away and walking toward him on the road. Mr. Branning noted that the victim "seemed to come out of" the nearby woods. Mr. Branning described the victim as "a little disoriented," unsure of where he was, and confused; Mr. Branning opined that the victim may have been dehydrated due to the heat.

---

[2] The witnesses in this case gave a significant amount of testimony regarding distances inside the landfill and their locations before and during the shooting. Unfortunately, much of this testimony evidently consisted of the witnesses' pointing at photographs instead of describing the relevant landmarks, and the photographs were not marked by the witnesses to facilitate our review.

Mr. Branning testified that he returned to his truck and turned it to face away from the victim because he did not know if the victim was dangerous or armed. Mr. Branning later stated, though, that it was "pretty obvious . . . that [the victim] didn't have anything[.]" Mr. Branning called Chris and narrated his observations of the scene, which Mr. Branning viewed in his rear view mirror. Mr. Branning stated that he saw a bulldozer following the victim; both the bulldozer and the victim were traveling toward Mr. Branning's truck. The bulldozer followed the victim for "a couple hundred yards" before stopping. Mr. Branning estimated that his truck was about one hundred fifty yards away from the victim and the bulldozer. Mr. Branning described the subsequent events as follows:

> I saw the [victim] walking down the berm, and the bulldozer following him, and then the [Defendant][3] got out of the bulldozer brandishing a weapon, and [he] appeared to be trying to get the [victim] . . . to stop walking. And the [victim] didn't seem to understand. [The victim] was kind of sporadic, and the next thing I know shots were being fired at the [victim's] feet, and the next thing I know the [victim] falls to the ground deceased.

Mr. Branning opined that the initial gunshots were "warning shots" because they struck the ground at the victim's feet in spite of the Defendant's being "pretty close" to the victim. Mr. Branning acknowledged that he could not hear what the Defendant said to the victim. Mr. Branning estimated that the bulldozer was within fifty yards of the victim. He stated that when the bulldozer stopped, the Defendant immediately stepped out onto the bulldozer's tracks and remained on the tracks during the shooting. Mr. Branning "pretty much immediately" saw the Defendant's gun, and he estimated that the incident occurred in one minute or less. Mr. Branning agreed that the victim was walking away from the Defendant when he was shot, and he denied that the victim ever walked toward the bulldozer. Mr. Branning did not recall whether the victim continued walking after he was shot, but he stated that the victim may have "stumbled" as he fell.

Chris testified that he received a telephone call from Mr. Branning informing him that the man for whom the police were searching was "walking down the road" and was being followed by a bulldozer. Chris drove to the top of a hill, passing Mr. Branning in his parked truck, and saw the victim walking down the road "and the dozer behind him, tracking him." Chris parked his truck and called 911. Chris agreed that a reasonable concern existed that if the victim reached the machine shop, he could have taken someone inside hostage.

Chris testified that he did not note anything unusual about the victim's demeanor, stating that he was "just walking." Chris said that the Defendant "cocked [the bulldozer]

---

[3] Although Mr. Branning could not identify the Defendant in the courtroom during his testimony, it is apparent and undisputed that the man following the victim was the Defendant.

-6-

sideways in the road" and exited the cab with a gun in his hand. Chris said that he was concerned because he was "right in the line with everything going on." As Chris contemplated moving and continued to call 911, "somehow they [got] . . . at an angle" from Chris such that he was no longer concerned about being in the line of fire. Chris did not recall being concerned that the victim was walking in his direction.

Chris testified that the victim looked back toward the Defendant several times as he continued to walk away from the bulldozer. Chris could not hear whether any conversation occurred. Chris said that the Defendant shot the victim while the victim was walking away, and he estimated that the Defendant was between fifty and one hundred feet from the victim. Chris noted that he saw the Defendant's gun "[v]irtually immediately" and that shots were fired "very quick," noting that the shooting occurred in the interval between his dialing 911 and the dispatcher's answering the call. Chris could not recall whether the Defendant was standing on the bulldozer's tracks or the ground during the shooting. Although Chris did not hear the gunshots, he recalled that multiple shots were fired. Chris testified that the victim "probably began staggering pretty – immediately" and that he was "stumbling, taking some steps until he collapsed."

Ms. Lynch arrived at the crime scene with Mr. Manis after the shooting. Ms. Lynch noted that during Mr. Jones's telephone call to Mr. Manis, Mr. Jones stated that he thought the Defendant "was gonna shoot this guy." Ms. Lynch testified that she saw the Defendant walking toward the victim's body with a gun in his hand and that she took a photograph with her cell phone before calling 911. The photograph, which was received as an exhibit, showed the prone victim on the ground; he was on his back with his arms drawn up to his chest, and his head was closest to the camera. Ms. Lynch also identified the Defendant in the photograph, although his face was not shown. The Defendant was standing near the victim's head such that he faced toward the camera and was perpendicular to the victim's body; the Defendant held a pistol pointed toward the ground in his right hand.

Ms. Lynch testified that the victim, who was still alive, had placed his finger in a gunshot wound. Ms. Lynch saw the victim's body "stretching out and stiffening." The Defendant stood over the victim, reached down, clasped the victim's hand, and said, "[S]tay with me kid." The Defendant asked Ms. Lynch if the victim was armed. In response, Ms. Lynch patted the victim's front pockets and felt "a piece of money and maybe a lighter."

Ms. Lynch testified that she told the Defendant he would be fired, and she described his demeanor as "like a scolded kid. Kind-a' had his head down." Ms. Lynch did not know whether the Defendant was upset.

Mr. Earwood testified that when he drove toward the machine shop to clock out for the day, he came upon the victim's body. Mr. Earwood stated that the Defendant stood

near the victim's feet and that he was "hysterical[,] . . . grabbing his head, and he . . . had his gun in his hand, and he was screaming, [']I shot him. I shot him. I told him I would. I told you I would.[']" The Defendant also stood behind Ms. Lynch and yelled, "[Y]ou know who this is? Is this the one? Is this the one?" When Mr. Earwood responded that he did not know, the Defendant stated, "[W]ell, I guess I lost my job now." The Defendant further stated, "[Oh], God. I lost my job now. I'll find me another one. I guess I'll go to work for Santek." The Defendant continued to ask who the victim was and said, "That's gotta be him."

Mr. Earwood stated that after the Defendant gave his shirt to Ms. Lynch, he "started walking unloading the rest of the shells that were in his gun." Mr. Earwood estimated that the Defendant was about two feet away from him as he "flipped" the unfired bullets out of the gun, although Mr. Earwood did not recall whether the bullets landed on the ground. Mr. Earwood acknowledged his TBI statement that Ms. Lynch turned over the victim's body. He agreed that "it looked like the body was flipping over" as he pulled up in his truck. Ms. Branam returned to the landfill to pick up Mr. Earwood and saw the Defendant place his hands on his head and state, "[W]ell, I guess I'll just go to work over here."

Deputy Bell testified that he responded to the crime scene and that the Defendant relayed his version of the incident to Deputy Bell. The Defendant stated that the victim was walking toward the bulldozer, that the Defendant told the victim to stop, that the victim did not comply, that the Defendant fired a warning shot, that the victim continued walking toward him, and that the Defendant shot the victim in the chest. Deputy Bell estimated that the victim's body was between fifty and seventy-five yards away from the bulldozer, "[m]aybe a little further."

Mr. Parker examined a photograph of the Defendant's bulldozer and estimated that it was ten or eleven feet tall; he stated that the doors to the passenger compartment locked, although the glass was not bulletproof. Chris testified that the Defendant's bulldozer was not equipped with a CB radio and that employees relied upon their cell phones to communicate. The testimony indicated that generally, Wright Brothers and Santek employees did not share their cell phone numbers with one another.

Former TBI agent Barry Carrier[4] testified that he responded to the crime scene, and he identified a video of the scene recorded by another agent. The recording, which was admitted as an exhibit, reflected a dirt road with a slope downward to the left and a hill to the right. A white truck was parked on the right shoulder of the road, and a piece of machinery was visible downhill from it to the left of the road in a grassy area. A bulldozer was visible some distance ahead of the white truck; the bulldozer was facing the camera and angled such that the back end was on the right shoulder of the road, the front end was

---

[4] Mr. Carrier was an Assistant District Attorney General at the time of trial.

on the left side of the road, and the road was mostly obstructed. The road appeared to curve left toward the camera, bordered by the grassy area and woods. On the road beside the grassy area and in the center of the curve, the victim's body was visible lying faceup. The victim's head was toward the main road, and his feet were pointing downhill along the curve. As the camera panned toward the bulldozer, evidence placards and shell casings were visible.

Agent Carrier stated that five shell casings were found five to six feet away from the bulldozer. He noted that he was five feet, eleven inches tall and that the bulldozer's tracks "were just above" his head. Agent Carrier stated that he prepared a diagram of the crime scene containing measurements between various landmarks. The diagram was received as an exhibit and reflected that the victim's head was 43 feet from a reference point, and the left corner of the blade of the bulldozer was 216 feet from the same reference point. Agent Carrier said that at the crime scene, the Defendant asked him if "he got the right person."

On cross-examination, Agent Carrier testified that a line of sight existed connecting the bulldozer, the victim's body, and the maintenance shop. Agent Carrier stated that to his recollection, the distance between the bulldozer and a possible bullet strike in the ground was about ten yards. He noted that it was impossible to determine conclusively whether the mark was, in fact, a bullet strike. Agent Carrier stated that a metal detector could be used to locate bullet fragments and that the TBI did not have one at the crime scene; however, he also stated would not have used a metal detector in this case because landfills contained many small pieces of metal. When asked whether it would have been beneficial to determine if the Defendant had fired warning shots, Agent Carrier responded negatively and stated, "It wouldn't have mattered." Agent Carrier affirmed that the Defendant's pistol contained nine unfired bullets and that five shell casings were recovered, for a total of fourteen bullets. Agent Carrier noted that the gun could hold fourteen bullets in the clip and an additional bullet in the chamber. Agent Carrier denied that unfired bullets were found on the ground at the crime scene. He agreed that if the Defendant had "flipped" unfired bullets from his pistol onto the ground, the TBI would have found them.

Agent Carrier testified that although semiautomatic firearms were designed to eject shell casings up and to the right, he had seen guns eject shells in various directions. Agent Carrier stated that he performed initial witness interviews at the crime scene and later performed formal follow-up interviews. Although he did not know the timeframe in which the formal interviews occurred, he disputed that he "waited" one month to conduct them. He acknowledged, though, that he interviewed Mr. Jones on October 3, 2016, and that the majority of the interviews occurred around the same time.

Agent Carrier testified that he used a laser device to take measurements at the crime scene and acknowledged that the device could not determine the location at which the

victim was shot. Agent Carrier acknowledged that several reddish-brown stains marked in the crime scene photographs tested negative for blood.

TBI Special Agent Laura Hodge, an expert in firearms identification, testified that the Defendant's gun contained eight bullets: six G-2 research brand, one Dynamic Research Technology brand, and one Winchester brand. She noted that the G-2 brand bullets, which were a type of "ball ammunition," were "a solid copper projectile . . . [with] a deep hollow cavity" containing "eight fingers that are called trocars" that split off upon impact to become "shrapnel." Agent Hodge determined that the shell casings at the scene were fired by the Defendant's gun. Agent Hodge also received seven copper trocar fragments and agreed that no method existed to connect them to a firearm. She stated that generally, a G-2 bullet was capable of passing through a human body. Agent Hodge had never seen G-2 ammunition used in practice and was only familiar with it as a part of the TBI "reference collection."

On cross-examination, Agent Hodge testified that a G-2 bullet had "less and more" penetration than a standard bullet, explaining that the trocars penetrated less but that the copper base "traveled farther than . . . most ammunition will[.]" She agreed that G-2 ammunition was legal to purchase. When asked to distinguish hollow point and G-2 bullets, Agent Hodge stated that both bullets had "petals" which peeled back upon impact, but hollow point bullets did not feature trocars and were "designed not to overly penetrate." She elaborated that a hollow point bullet was designed not to pass through a person. Agent Hodge agreed that very small firearms existed, all of which could inflict fatal injuries, and that based upon the size of a firearm, it could be carried in a pocket while walking or jogging.

Dr. Steven Cogswell, an expert in forensic pathology, testified that he performed the victim's autopsy, that the cause of death was a gunshot wound "to the chest," and that the manner of death was homicide.[5] Dr. Cogswell could not determine the distance from which the shot was fired due to a lack of gunpowder stippling or burns on the victim's body. Dr. Cogswell stated that he was shown a G-2 bullet by a TBI agent.

Dr. Cogswell testified that the bullet entered the right side of the victim's back near the shoulder blade, creating a "gear tooth" pattern that was specific to the G-2 bullet. The bullet then divided into fragments, lacerating the right lung and "all of the big blood vessels of the lung" as well as the right atrium of the heart. The fragments were "caught" in the chest muscles and back side of the breast bone, and the bullet core exited the victim's central front chest area. Dr. Cogswell noted that the bullet's pathway was "forward right-to-left and upward."

---

[5] Dr. Cogswell noted that his office's practice was not to list a manner of death in the autopsy report, as the supervising Medical Examiner completed and issued the death certificate.

Dr. Cogswell testified that as a result of the gunshot wound, the victim lost about one-quarter of his blood volume inside the chest cavity and bled to death. Dr. Cogswell stated that the victim tested positive for "a fairly high concentration" of methamphetamine, as well as amphetamine and marijuana metabolites; he noted that methamphetamine generally also contained amphetamine. Dr. Cogswell stated that the effect of methamphetamine on a person was "pretty individualized" and that unlike alcohol, no method existed to determine a person's reaction to methamphetamine based upon the quantity of methamphetamine in the blood. Dr. Cogswell noted that a person could develop tolerance to "behaviorally altering drugs like opiates and stimula[nts]" and that even relative to alcohol, which was more commonly understood, individual reactions varied to the same quantity ingested.

On cross-examination, Dr. Cogswell testified that due to the angle of the shot, it was impossible for the Defendant to have shot the victim while standing on the bulldozer's tracks; he noted, however, that if the victim were bent forward, a shot could have come from above and still have resulted in an upward trajectory in the body. Similarly, in order for the bullet to have exited the body to the left of where it entered, the victim would have been turned toward the Defendant to some degree. Dr. Cogswell acknowledged the possibility that the victim was bent forward consistently with running or walking; he agreed that the victim could have reached inside his shorts pockets from such an angle, depending on the manner in which the shorts were worn and the location of the pockets. Dr. Cogswell agreed that the victim would have been capable of continuing to run or walk after he was shot. He reiterated that he could not determine whether the victim was under the influence of methamphetamine without having observed the victim's behavior.

On redirect examination, Dr. Cogswell testified that it was impossible that the victim was facing the shooter. He agreed that his findings were inconsistent with the Defendant's assertion that the victim was coming toward him.

After the State concluded its proof, the trial court reviewed the proposed jury instructions. The Defendant objected to the inclusion of the pattern jury instruction on transferred intent, which read as follows:

A defendant's consci[ous] objective need not be to kill a specific victim . . . . [If] you find beyond a reasonable doubt that the Defendant intended to cause the result[,] the death of a person, that he did so with premeditation, then the killing of another even if not the intended victim would be [First] Degree Murder.

The Defendant argued that transferred intent was not factually supported and that the instruction would confuse the jury. The State responded that a juror "could reasonably question because [the Defendant] did not specifically know [the victim], whether or not he

could, in fact, devine [sic] an intent to kill that person, or premeditation [as] to that person." The State argued that because the Defendant did not know if he had "shot the person he intended" to shoot, the instruction should be included. The trial court agreed with the State.

Relative to the instruction on defense of a business, the State argued that the victim did not use force when entering the landfill, which was an open and public property, and that the Defendant was not tasked with securing it. The Defendant responded that because employees routinely "engage[d] trespassers," the Defendant was an agent of the landfill tasked with securing it. The State noted that to its understanding, employees questioned visitors in order to ensure the visitors' safety. The trial court found that the jury instructions were already lengthy and that it was concerned the jury "might get lost in . . . the minutia" of the definitions of a dwelling and a business. The court noted that the victim "just came out of the woods" and that the portion of the instruction regarding forceful entry did not apply in this case. The court noted that it would reconsider the instructions after the Defendant's proof.

The trial court noted that the Defendant had requested "only one little portion of" the pattern instruction regarding private arrest, which was as follows: "A private person may arrest another when a felony has been committed, and the arresting person has reasonable cause to believe that the person arrested committed the felony." The court and the Defendant agreed that based upon the State's proof, the victim's having committed a felony had not yet been proven under the probable cause standard required to support the instruction. The Defendant agreed to take up the issue again after his proof.

The Defendant testified that grew up in Indiana and served in the United States Navy. The Defendant stated that after he left the Navy, he was trained in operating heavy machinery, including bulldozers. Relative to his health, the Defendant said that he had undergone two hip replacements, that the "[t]op of" one of his femurs had been replaced, that he had "four bad vertebrae" as a result of a fall, and that he had a pacemaker. The Defendant stated that he was an Alabama resident at the time of the shooting and had an Alabama concealed carry permit. He owned and carried a Smith & Wesson .40-caliber VE pistol, which he acknowledged was the same pistol introduced into evidence. The Defendant stated that he used "rip rounds" in his gun because they had "the least amount of penetration for . . . personal protection"; he explained that if a gun were fired within a home, the shooter sought to avoid the bullet's going through an intruder or a wall and injuring an unintended target.

The Defendant testified that on September 8, 2016, he was working for Wright Brothers, which provided accommodations for its workers in Bradley County. Around noon, the Defendant received a call from his supervisor Johnny Miller, who conveyed that the police were looking for "somebody that's armed and dangerous" and that the Defendant needed to "get outta' there." The Defendant stated that he kept his gun in his lunchbox and

-12-

that when he was at the picnic area, he wore it on his hip. He noted that he carried the gun because it was unwise to leave it unattended. The Defendant affirmed that it was common for Wright Brothers employees to carry firearms.

The Defendant testified that Chris gave the employees "a brief overview" of the situation and that the Defendant spoke to two deputies "stationed" at the picnic area. One of the deputies "had an AR sitting in his lap" and was at the picnic area to "keep an eye on things"; the deputy told the Defendant that the fugitive was armed and dangerous, that he had "a couple of weapons," and that he "already tried to take out some Sheriff's [d]eputies along the way over here" from another county. The Defendant noted that a SWAT team was present at the tallest hill in the landfill. While the Defendant was at the picnic area, he conversed with other employees. He stated that everyone was trying to obtain information using their cell phones and that a police helicopter arrived. The Defendant recounted the following conversation:

> And somebody had said that they put the dogs on 'em, and . . . one of the guys said, yeah, there'll [sic] probably let the dogs get him. And another person said, . . . if they shoot that helicopter they [were] gonna shoot him. They . . . [were] gonna snipe him from up there.
> And I said, if . . . he goes through my yard, and he's armed like that and carrying on, I'd shoot him too.

The Defendant acknowledged that he used expletives on that occasion, explaining that he was "a sailor" and that his coworkers' "circle of people" used "rough language." The Defendant denied intending to become a vigilante when he made the statement. He noted that everyone was bragging about what they would do "whether it was good, bad, or indifferent." The Defendant denied that anyone told him the fugitive was unarmed.

The Defendant testified that after three and one-half hours, the employees were cleared to return to work and that although he "figured everything . . . was good at that point," the helicopter and police officers were still present. The Defendant returned to his bulldozer and continued wearing his gun because "nobody said for sure whether . . . this guy was caught or what[.]" He commented that the employees were "just a little worried" about returning to work and that they "looked at each other like [they] were chum . . . for shark bait[.]" The Defendant noted that he would not have fought the fugitive for fear of dislodging his pacemaker wire.

The Defendant testified that after returning to work, Chris drove by him, and they briefly discussed the Defendant's work. The Defendant knew that the liner crew and Mr. Jones were working nearby. The Defendant was backing the bulldozer off of a hill when he saw a person coming out of the woods. When the Defendant turned the bulldozer around, he looked through the windshield and saw the victim, who was wearing cargo

-13-

shorts and a black t-shirt. The victim "was starting to turn up the hill to go out of the burrows." The Defendant stated that he called Mr. Miller, who told the Defendant to "keep an eye on him. Follow him."

The Defendant testified that he briefly lost sight of the victim and that when the Defendant drove the bulldozer toward the hill, he saw the victim turn right toward a berm. The Defendant stated that he followed the victim "like [he] was told," and he saw the victim pass Mr. Jones and do "something with his hands." The Defendant said that as he passed Mr. Jones, he looked at Mr. Jones and "[went] -- what's this all about? . . . [W]hat's he doing?" Mr. Jones shook his head, which the Defendant interpreted as "he didn't know." The Defendant stated that he caught up with the victim and that he maintained a certain distance to avoid running over the victim. The Defendant said that he determined that the victim was going to the machine shop and that anyone in the machine shop would have "no idea what's going on." The Defendant stated that at this juncture, he believed the victim was armed and dangerous because "the [p]olice said so."

The Defendant testified that he drove past the victim and parked the bulldozer such that he "partitioned off the road a little bit," then opened the door and walked down its tracks. The Defendant stated that once he reached the ground, he walked toward the victim, greeted him, and told him that he could not be there. The Defendant noted that the victim was barefoot. The Defendant stated that the victim's eyes "got real wide"; the victim said, "F---" and "just lit off . . . like he was cussing a dog"; and the victim made a movement with his head, "backed down," put his hands in his pockets, and began walking more rapidly toward the Defendant. The Defendant stated that the victim repeatedly said, "You'll go before I go." The Defendant interpreted the statement to mean, "Something's happening. I'm in jeopardy."

The Defendant testified that he loudly asked the victim to stop and to show his hands. The Defendant stated that he backed away from the victim and noted that "with his hands in his pockets [the Defendant] didn't know if he was going for a gun or a knife." The Defendant stated that he drew his gun and aimed it at the ground, which the Defendant opined "looked like it made [the victim] madder." The Defendant said that the victim kept advancing and "picked up the pace." The Defendant stated that he fired three times into the ground while backing away from the victim and repeating his request for the victim to show his hands, but the victim did not comply and continued to curse at the Defendant. The Defendant stated that he heard the victim say the word "kill" three times, but he did not recall the context in which the word was used.

The Defendant testified that he backed up so that the bulldozer was in front of him and that the victim advanced more quickly than the Defendant could move away. The Defendant turned to the left, and the victim went "across in front of" the Defendant before turning around and coming back toward the Defendant while "stomping his feet." The

Defendant noted that the victim was "still cussing and carrying on." The Defendant again asked to see the victim's hands, yelled at him to stop, and fired a bullet into the ground about ten feet in front of the victim. The Defendant stated that "it got [the victim's] attention" and that the victim turned around, took one step, and went "down" into the grass before turning and "[coming] up towards [the Defendant] fiddling with his hands in his pockets." The Defendant noted that he believed the victim was trying to find a gun or ammunition. The Defendant described his state of mind as follows:

> But at this point I got scared of thinking about everybody else and I started thinking . . . this is not good, because I'm out here by myself now. Cuz' he's coming around back, after I fired the other shot in the dirt on that side -- my side of the grass, he dropped back down and made like a loop and came straight up the slope at me.
>
> . . . .
>
> Because when he looked at me, he brought his arms up out of the left side and looked right over his shoulder at me, and I looked him right straight in the eye. And he was gritting his teeth like he was gonna bite -- and just cussing through his teeth and spitting and everything, and I thought I was gonna get shot. So I pulled up and hollered -- no! As quick as I could and as loud as I could and I shot at him.

The Defendant affirmed that he was afraid of dying. He stated that he fired one shot to protect himself; the victim turned to the left, "scrambled" down the hill, came back up the hill, "slowly put himself" on the ground, and rolled over with his hands on his chest. The Defendant said that he believed he had struck the victim in the front and that when he fired, he "had a side view" of the victim's body. The Defendant noted that he had been looking the victim in the eye when he fired and that "[it] was purely defensive."

The Defendant testified that he yelled to the prone victim and asked if he was hit; he saw the victim move and walked to the body with his pistol pointed down. The Defendant stated that he did not know if the victim was armed "or if he was gonna get up and surprise somebody[.]" The Defendant characterized his own demeanor in Ms. Lynch's photograph as "[l]ike we need some help for this young man." The Defendant noted that he did not like what happened and that he was going to remember it.

The Defendant testified that after Mr. Manis and Ms. Lynch arrived, the Defendant held the victim's hand and said, "[H]ang in there kid." The Defendant said that he did not want anyone to die and that he was in shock. The Defendant stated that the relevant events occurred within seconds. The Defendant recalled his asking Agent Carrier whether he "g[o]t the right guy," and he explained that "any normal person would second guess it, like, was this the right thing?" When asked whether the victim's identity as the fugitive mattered if the victim were threatening to kill the Defendant, the Defendant responded, "From that

-15-

standpoint, no . . . . You need to protect yourself. But after you find out all this other information, what are you supposed to do? I mean, it's an ugly thing."

On cross-examination, the Defendant acknowledged Chris's[6] testimony that the Defendant stood on the bulldozer's tracks and fired, which was "very different" than the Defendant's version of events. The Defendant further acknowledged Mr. Branning's testimony that the Defendant stepped out of the bulldozer and immediately shot the victim; however, the Defendant disagreed with that assessment. The Defendant said that none of the witnesses could hear any conversation between him and the victim. When asked how he would explain the discrepancies between the witnesses' testimony and his version of events, the Defendant responded that some of the testimony was consistent with his. The Defendant cited as an example Mr. Jones's testimony that after the Defendant fired a warning shot, the victim turned around and went down the hill. The Defendant acknowledged that the witnesses at the picnic area heard him threaten to shoot the fugitive. The Defendant agreed that the phrase "I'll shoot the mother f---er" was a strong statement, but he noted that "everybody there was talking some kind of trash about it." The Defendant denied saying he would "do what the [p]olice can't do," and he opined that the testimony was fabricated.

The Defendant testified that he received firearms training in the Navy, including assessing when a reasonable threat existed, whether the person had the ability to carry out the threat, and whether the threat was imminent and required the use of deadly force. The Defendant further agreed that in concealed carry permit training, he was trained to be "certain of the circumstances" and understand the level of threat he was facing.

The Defendant testified that during the lockdown, he had the impression that the fugitive was carrying a long gun and a handgun. The Defendant stated that he heard about news reports from other employees. The Defendant said that when the lockdown was lifted, everyone present asked Mr. Miller why they were returning to work. When asked whether his employer would have sent him into a dangerous situation, the Defendant responded that they would not "intentionally" do so; he acknowledged that he trusted his employer and went back to work.

The Defendant testified that when the bulldozer was in motion, a person could not step on the track because it rotated constantly. He further agreed that he was not in any danger of being assaulted when he was moving and inside the bulldozer, although the windows were not "shatterproof." The Defendant stated that it would be difficult to enter the bulldozer's cab.

---

[6] Although the prosecutor referenced Chris Parker here, the record reflects that only Mr. Branning testified that the Defendant fired the shots while standing on the bulldozer's tracks.

The Defendant denied that on a previous occasion, he attempted to run a motorist off the road in order to assist the police. The Defendant further denied conveying such a story to Agent Carrier, explaining that "[t]he story that he got was misinterpreted" and that Agent Carrier was mistaken.

Relative to his brief conversation with Chris after he returned to work, the Defendant testified that Chris did not ask whether the Defendant was afraid and noted that Chris was busy with his cell phone. The Defendant stated that when he initially saw the victim, the victim's shirt was pulled "up around his chest" and the victim's waistline was exposed. The Defendant agreed that he could ascertain that the victim did not have a long gun. The Defendant acknowledged that when the victim saw the Defendant's backing up in the bulldozer, he turned and walked away from the Defendant. The Defendant estimated that the victim was between 200 and 250 feet from him.

The Defendant testified that although he believed the victim was the fugitive, he did not call 911 at any point during the encounter. The Defendant acknowledged that Mr. Miller told him to follow the victim, not to engage him. The Defendant stated that the victim walked at a "normal" pace and that the Defendant maintained a distance of less than 200 feet behind the victim. The Defendant acknowledged that the victim walked between one-quarter and one-half of one mile for about five minutes before he passed Mr. Jones. The Defendant did not know whether Mr. Jones was carrying a gun. The Defendant testified that the victim "kept a bee line -- straight down" and did not move toward Mr. Jones's equipment, although the victim looked toward him. The Defendant denied that the victim acted aggressively toward Mr. Jones or drew a weapon. The Defendant acknowledged that he allowed the victim to walk past "one of [the] coworkers that . . . [he was] so concerned about." The Defendant stated that at that point in time, no cause for concern existed.

The Defendant testified that he followed the victim for another 200 yards before parking the bulldozer. The Defendant agreed that in the approximately ten minutes he observed the victim, the victim did not speak or act aggressively toward anyone. The Defendant affirmed that the victim did not confront him. When asked when he decided it was his responsibility to make contact with the victim, the Defendant stated,

> When we got past the pump station, I passed him and looked and couldn't see the expression on his face, cause it's dusty. And if he's going up there and this is the guy . . . just-- talk to him, you know. Because he's going up to a place where nobody can see him coming if he does turn aggressive. If he's got a handgun I can't see it. So, I don't know.

When asked whether, given his health conditions, the Defendant placed himself in danger by exiting the bulldozer, the Defendant stated that he and the victim were just going

-17-

to talk.  The prosecutor questioned the Defendant's intent to talk to the victim given his expressed fear and the atmosphere of the day's events; the Defendant responded that the victim had not been aggressive.  The Defendant acknowledged that he left his cell phone in the bulldozer and did not call 911 upon exiting.  The Defendant stated that when he exited the bulldozer, the victim was behind him at a distance equivalent to the distance from the witness stand to "this room . . . behind [the Defendant]."

The Defendant testified that when he engaged the victim in conversation, they were about sixty feet apart and that the victim was walking toward him.  The Defendant denied that he "intended to deal with" the victim himself.  When asked why he did not call the police, the Defendant stated that he had to talk to the victim because people were in the machine shop and had "no idea what[ was] coming at them."  The Defendant stated that he was concerned for their safety; he believed that if he talked to the victim, the victim might stop until the police came.  The Defendant acknowledged that when the victim cursed at him, he did not get back into the bulldozer; he reiterated that he wanted to "keep an eye on" the victim for the safety of the people at the machine shop.  The Defendant acknowledged that he did not ask Mr. Manis to evacuate the landfill.

The Defendant testified that when the victim began searching for something in his pockets, they were about thirty feet apart.  The Defendant noted that the victim's demeanor had changed.  The Defendant held his gun to his side and "in front of" him.  He denied that he was "looking to engage anybody."  When asked to reconcile his testimony with Chris's assertion that the victim was 150 to 200 feet from the Defendant when he was shot, the Defendant responded that Chris arrived after the victim walked past the bulldozer.  The Defendant agreed that when he exited the bulldozer, he had no cover and that he was standing above the victim.  The Defendant stated that the victim came within an arm's length of him as he passed.  The Defendant denied that the victim reached for the Defendant's gun.  The Defendant stated that he stepped out of the victim's way because he had already fired three warning shots.  After he fired the shots, the victim "screamed louder and harder" and began walking quickly toward the Defendant.  The Defendant backed up toward the bulldozer's "blade" and moved to the left when it was possible to do so.  The victim continued walking straight away from the Defendant and eventually turned around, still cursing and searching his pockets.  The Defendant stated that he fired a fourth warning shot and that the victim turned around, took one step toward the machine shop, and went down into a grassy area.  When the victim came back up to the road, he was still searching his pockets, and the Defendant fired a fifth shot.  The victim "was in the gravel on this side of the grass," still cursing, and "[w]ent down a little bit, and then came" toward the Defendant at an angle.  The Defendant also stated that the victim "turned around . . . [and] he looked over his shoulder at [the Defendant] and brought his hands around like he had a handgun[.]"  The Defendant fired a sixth time at the victim, and the victim turned around and walked toward a track hoe.  The Defendant acknowledged that he fired five warning shots and that the victim never produced a weapon.  The Defendant stated that after he shot

the victim, the victim ran a distance before lying down on the ground. The Defendant acknowledged that he did not run after the victim or call 911, even though he did not know if he had struck the victim and the victim was running toward his coworkers. The Defendant stated that he aided the victim by telling Ms. Lynch to call 911.

Terry Stephen Posey testified for the defense that he owned a gun and pawn shop and that if a customer wanted to purchase ammunition for self-defense, he recommended hollow point ammunition because when it hit a target, it expanded and was a "more deadly round." Mr. Posey stated that an "RIP," or rest in peace, round was a self-defense round that "actually . . . bust[ed] open," unlike a standard hollow point round that simply opened or expanded. He explained that one RIP round would "turn into mini-projectiles." He affirmed that such ammunition was legal and that he sold it at his shop for "defense" and not "murder." On cross-examination, Mr. Posey stated that RIP rounds were "a lot more dangerous where . . . just a ball round MO is gonna make a single shot, those carry rounds are made to destroy." He agreed that he believed in responsible handgun use and that he was against improper use of firearms.

Dr. Glen Edward Farr, an expert in pharmacology and toxicology, testified for the defense that he reviewed the victim's toxicology report, which reflected that the victim's blood contained 451 nanograms per milliliter methamphetamine and 81.3 nanograms per milliliter amphetamine, which was usually contained in methamphetamine. Dr. Farr testified regarding the potential behavioral effects of methamphetamine, including euphoria, feelings of invincibility, irrational and violent behavior, hallucinations, and paranoia. According to scientific case studies, the amount of methamphetamine the victim had in his blood could have produced erratic, confused, agitated, irrational, or violent behavior. Dr. Farr agreed that a person's affect could change quickly "from fight to flight" while under the influence of methamphetamine. He stated, though, that without having observed the victim, he could not opine as to the specific effects of methamphetamine on the victim's behavior.

At the rest of the Defendant's proof, argument resumed regarding jury instructions. The State averred that the private arrest instruction was not supported by the evidence; the prosecutor noted that the Defendant's testimony indicated that the victim "came within arm's reach of [the] Defendant, and he did not attempt to detain him . . . . What he did was he let him pass and then shot him." The Defendant responded that he believed he was protecting others. The trial court found that according to the police testimony, "it wasn't until well after the fact that they figured out [the victim] had a prior felony, and that he could have been in possession of a firearm." The court concluded that the private arrest instruction had not been fairly raised by the proof because the evidence did not establish that the Defendant knew that a felony had been committed.

-19-

Upon this evidence, the Defendant was convicted of the lesser-included offense of second degree murder and sentenced to seventeen years, six months in confinement. He timely appealed.

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by denying his motion to disqualify the district attorney's office; (2) the evidence was insufficient to sustain his conviction; (3) the court erred by excluding police testimony regarding the victim's state of mind; (4) the court erred by admitting a portion of the Defendant's police statement referring to a prior bad act; and (5) the court erred by giving a jury instruction on transferred intent and by declining to give jury instructions on private arrest and defense of a business.

### I.     *Disqualification*

The Defendant contends that the district attorney's office as a whole should have been disqualified from prosecuting his case because the assistant public defender representing him, Paul Moyle, was hired as an assistant district attorney general shortly before the first scheduled trial date. Although Mr. Moyle did not participate in the Defendant's trial, the Defendant argues that the district attorney's office's "chain of command" was structured such that "the mere fact that [Mr.] Moyle was hired by and [was] directly answerable to General [Stephen] Crump," who personally prosecuted the Defendant's trial, raised an "eyebrow of scrutiny." The Defendant notes that although he is not accusing the State of intentional impropriety, because the elected District Attorney General was "intimately" involved in this case and Mr. Moyle had extensive contact with the Defendant prior to leaving the public defender's office, the existence of an opportunity for the "incidental passing of information" or a risk of harm was cause for recusal of the entire office.

Prior to trial, the Defendant filed a March 29, 2018 motion to disqualify the district attorney's office from prosecuting his case, citing Mr. Moyle's March 16, 2018 notice to his employer that he would be joining the district attorney's office on April 2, 2018. At that time, the trial was scheduled for May 8, 2018. The Defendant argued that because General Crump was prosecuting his case and was also personally responsible for Mr. Moyle's hiring "on the eve of trial," there was an appearance of Mr. Moyle's passing confidential information to his supervisor. The Defendant acknowledged that screening methods were likely in place at the district attorney's office, but averred that because the hiring was in progress, there was "no opportunity" to employ those methods.

The State responded that General Crump had personally discussed the need for screening with Mr. Moyle before his swearing-in. The State also provided a description of the unwritten but customary screening protocols in that office, including keeping the case

file out of the general case management system and prohibiting discussion of the case between Mr. Moyle and any involved staff members. Mr. Moyle submitted an affidavit affirming that he would abide by the screening procedures and that he had not shared any confidential information regarding the Defendant's case with his new employer.

At a pretrial hearing on the motion, the trial court found that although Mr. Moyle had an actual conflict of interest, the district attorney's office had adequate screening measures in place that the presumption of shared confidences was rebutted. The court noted its previous employment with the same office and its experience that confidential information was not shared in similar situations.

A trial court's ruling on the disqualification of a prosecutor or the entire office of the District Attorney General is reviewed under an abuse of discretion standard. Clinard v. Blackwood, 46 S.W.3d 177, 182 (Tenn. 2001); see State v. Culbreath, 30 S.W.3d 309, 313 (Tenn. 2000). In determining whether disqualification of a prosecutor is required, courts must consider the following factors:

> (1) Do the circumstances of the defendant's case establish an actual conflict of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified?

State v. Coulter, 67 S.W.3d 3, 29 (Tenn. Crim. App. 2001) (citing Culbreath, 30 S.W.3d at 312-13), (abrogated on other grounds by State v. Jackson, 173 S.W.3d 401 (Tenn. 2005)). The parties agree that Mr. Moyle had an actual conflict of interest such that he could not have personally prosecuted the Defendant's case. See Tenn. Sup. Ct. Rule 8, RPC 1.11(d)(2)(i), 1.9(a).

In Clinard, our supreme court adopted a three-step analysis used in Schiessle v. Stephens, 717 F.2d 417, 420-21 (7th Cir. 1983), to determine whether an attorney's prior representation mandates vicarious disqualification of the attorney's new office:

> 1) whether a substantial relationship exists between the subject matter of the former and present representations.
> 2) whether the presumption of shared confidences which arises from its determination that the representations are substantially related has been rebutted with respect to the former representation.
> 3) whether the presumption of shared confidences has been rebutted with respect to the present representation.

-21-

Clinard, 46 S.W.3d at 184 (quoting Tenn. Bd. of Prof'l Resp., Formal Op. 89-F-118, 1989 WL 534365, at *3 (Mar. 10, 1989)).

In this case, Mr. Moyle represented the Defendant until just before his first trial date; it is undisputed that Mr. Moyle had a substantial attorney-client relationship with the Defendant and that they discussed confidential information. The remaining issue was whether the State rebutted the presumption of shared confidences within the district attorney's office by demonstrating adequate screening procedures.

A court assesses the need for disqualification of a district attorney's office using "a case-by-case evaluation of the screening mechanisms employed." Coulter, 67 S.W.3d at 30 (citing Clinard, 46 S.W.3d at 184-185; see Tenn. Bd. Of Prof'l Resp., Formal Op. No. 87-F-111, 1987 WL 364065, at *2 (Sept. 16, 1987)). Factors a court may consider include, but are not limited to, the following:

> 1) the structural organization of the law firm or office involved,
> 2) the likelihood of contact between the "infected" person and the specific attorneys and support personnel involved in the present representation,
> 3) the existence of law firm or office rules which prevent the "infected" person
> a) from access to relevant files or other information pertaining to the present litigation and
> b) from sharing in the fees derived from such litigation.

Clinard, 46 S.W.3d at 184. "In weighing the above factors, the question to be asked is 'whether the screening mechanisms reduce to an acceptable level the potential for prejudicial misuse of client confidences.'" Coulter, 67 S.W.3d at 31 (quoting Clinard, 46 S.W.3d at 184).

In his appellate brief, the Defendant declines to cast aspersions on the actual conduct of Mr. Moyle or General Crump and acknowledges that screening mechanisms likely exist in General Crump's office. Instead, the Defendant focuses on the opportunity for "incidental" passing of confidential information based upon the timing of Mr. Moyle's departure from the public defender's office and the rigid hierarchy of the district attorney's office. The Defendant impresses upon this court that "there must [be] a line drawn somewhere as to what exactly is the point of no return when changing sides."

In Clinard, our supreme court held that based upon the appearance of impropriety, a private attorney's conflict of interests was imputed to his new firm when the attorney previously represented a party in a civil case, the case was still pending, and the attorney's new firm represented the opposing party. 46 S.W.3d at 188. However, this court later

concluded that pursuant to Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.11, which had not yet been adopted at the time of the Clinard decision, "district attorneys general's offices are not subject to the Clinard per se disqualification rule based upon the appearance of impropriety." State v. Orrick, 529 S.W.3d 877, 888-89 (Tenn. Crim. App. 2018).

In this case, there was no indication that confidential information was shared by Mr. Moyle upon commencing his employment with the District Attorney's Office. Indeed, both Mr. Moyle and General Crump affirmed that they had discussed the need for screening procedures in Mr. Moyle's pending cases, including the Defendant's case, before Mr. Moyle's hiring and that sufficient procedures were routinely used in the office, including keeping the Defendant's case file out of the electronic records system and instructing the staff working on the case not to discuss it in Mr. Moyle's presence. Mr. Moyle had no supervisory authority over any staff member involved with the Defendant's case, and he affirmed that no sharing of confidential information occurred. We decline the Defendant's invitation to draw a temporal line beyond which a special prosecutor would have to be appointed; our jurisprudence provides for a thorough case-by-case examination of each set of circumstances, which we believe is sufficient to protect defendants' rights. We note that although the trial was originally scheduled for May 8, 2018, it was continued until July 18, 2018, during which time new trial counsel was able to meet with the Defendant and more than adequately prepare for trial.[7] The trial court did not abuse its discretion by finding that the district attorney's office was not vicariously disqualified in this case. The Defendant is not entitled to relief on this basis.

## II.    Sufficiency of the Evidence

The Defendant raises two issues relevant to the sufficiency of the evidence. The first is that the evidence was insufficient to disprove his claim of self-defense; the Defendant argues that because he was in reasonable fear for his life under the circumstances, he was not acting unlawfully by shooting the victim. The second is that the Defendant should have been convicted of voluntary manslaughter because he was in a state of "passion and apprehension" created by the conduct of the victim and law enforcement and thus acted under adequate provocation. The State responds that the evidence is sufficient.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence;

---

[7] Before the Defendant's trial testimony, trial counsel noted, and the Defendant confirmed, that they met between ten and twenty times before trial.

rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"Second degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11- 302(b).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of

a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

As a preliminary matter, both of the Defendant's sufficiency issues relate to the weight of the evidence and the jury's credibility determinations, which this court will not disturb on appeal. Bland, 958 S.W.2d at 659. The Defendant's self-defense argument relies almost exclusively on his own statements regarding the atmosphere created by law enforcement and the victim's alleged aggressiveness. The jury, by its verdict, discredited his testimony.

Moreover, because the jury unanimously found the Defendant guilty of second degree murder, it was not required to then determine whether he was guilty of voluntary manslaughter. However, if the jury considered voluntary manslaughter, it was responsible for reviewing the evidence to ascertain whether it supported a finding of adequate provocation, and this court will not disturb its determination on appeal. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001).

We conclude that the evidence is sufficient to support the jury's verdict relative to the lesser-included offense of second degree murder. In the light most favorable to the State, the record reflects that the Defendant, who was inside a ten-foot-tall bulldozer with a door that could have been locked, chose not to call the police and instead followed the victim for a substantial amount of time—ten minutes—before pulling in front of the victim, confronting him, and shooting him in the back. The victim was described as behaving in a confused manner, not an aggressive one, and he was moving away from the Defendant when he was shot. Moreover, the victim had passed by Mr. Jones some minutes previously without advancing toward him or otherwise indicating that he was dangerous. Dr. Cogswell testified that the victim's wound could not possibly have been caused while the victim was running toward the Defendant. The evidence was sufficient for a rational trier of fact to find that the Defendant was not in reasonable fear for his life when he shot the victim in the back.

Likewise, the evidence was sufficient to support the jury's finding that the Defendant shot the victim with the awareness that it was reasonably likely to kill him and that the victim died as a result. Earlier in the day, the Defendant was overheard by multiple coworkers bragging that he would kill the fugitive and do what the police could not. Additionally, the Defendant had loaded his gun with bullets that were designed to cause the maximum possible damage to a target. The Defendant is not entitled to relief on this basis.

-25-

### III. Excluded police testimony

The Defendant contends that the trial court erred by excluding the testimony of "multiple witnesses" regarding the facts underlying the traffic stop and the victim's status as a convicted felon. The State responds that the testimony was properly excluded.

Before the Defendant put on his proof, the State lodged an objection to anticipated testimony by police officers regarding the events of the traffic stop. The Defendant made an offer of proof in which Bradley County Sheriff's Deputy Scottie Wiggins, who worked for the Meigs County Sheriff's Department at the time of the shooting, testified. Deputy Wiggins stated that he saw the victim's stepfather's SUV leave a known drug house and cross the center line of traffic in Meigs County. Deputy Wiggins stopped the SUV, and neither the victim's stepfather, who was driving, nor the victim produced identification, although they gave their names and birth dates. Deputy Wiggins noticed a box of ammunition on the vehicle's dashboard and inquired as to the presence of firearms in the SUV. The victim's stepfather asked the victim if the stepfather's .40-caliber pistol was still in the car. The victim answered affirmatively and stated that it was in the console. The victim's stepfather also told Deputy Wiggins that he had a shotgun in the backseat. Deputy Wiggins was notified by police dispatch that the victim's stepfather had a revoked driver's license; when Deputy Wiggins asked him to step out of the car, the victim's stepfather fled in the SUV, almost striking an officer. The police chase continued through Meigs County and Hamilton County; while in Meigs County, the victim's stepfather crashed into two police cars. The SUV was brought to a stop outside the Bradley County landfill by using a "pit maneuver." Both the victim and his stepfather climbed out the driver's side window and fled on foot in spite of commands to stop. The victim's stepfather was eventually arrested. After Deputy Wiggins returned to the police station but before the shooting, he searched for the victim's criminal history and discovered that the victim was a convicted felon. Deputy Wiggins noted that "a lot of" officers were involved in the manhunt. Deputy Wiggins did not know with certainty whether the victim was armed, and he did not know why other officers concluded that the victim might be armed.

On cross-examination, Deputy Wiggins testified that it was clear from the context of his conversation with the victim's stepfather that the .40-caliber pistol belonged to the stepfather. Deputy Wiggins agreed that there was no opportunity for the victim to exit the SUV during the chase. He denied that he saw the victim or his stepfather carrying a weapon as they exited the SUV. He affirmed that the pistol was found inside the SUV.

The State argued that the landfill employee witnesses had testified to the information communicated by law enforcement, which did not include the victim's felon status. The State noted that the Defendant would have the opportunity to testify regarding what he knew at the time.

The Defendant responded that the testimony would complete the story and was relevant to the Defendant's belief that he was in danger. In particular, the Defendant argued that this background information tended to prove that the victim was the same "armed and dangerous and violent" person for whom the police were searching. The Defendant noted that because the State had requested a jury instruction on transferred intent, the victim's identity as the fugitive had become relevant. The Defendant further stated that evidence of the victim's having committed a felony was necessary in order to justify a jury instruction on private arrest. The Defendant argued that law enforcement's awareness of the victim's constructive possession of a firearm provided factual support for the private arrest jury instruction, which required that the Defendant know that a felony had been committed by the victim.

The trial court granted the State's motion, finding that the information known only by law enforcement was not relevant. The court noted that the Defendant would be permitted to present evidence of the law enforcement measures present at the landfill, such as the SWAT team and helicopter, as well as any other facts known to the Defendant at the time of the shooting.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence pursuant to these rules "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)).

On appeal, the Defendant argues that the pattern instruction on self-defense permits the jury to consider "all the facts and circumstances surrounding and leading up to" the Defendant's use of lethal force. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010). The Defendant argues that as a result, "the entire narrative of the victim's violent conduct leading up to the incident" is relevant to the reasonableness of the Defendant's perception that his life was in danger. The Defendant specifies that the jury should have heard evidence of "the alleged car chase, aggravated assault, felony fleeing, and possession of weapons[.]"

We do not accept the Defendant's assertion that the pattern instruction on self-defense, which focuses on the Defendant's subjective belief of a threat and then instructs the jury to determine its objective reasonableness, makes relevant facts not known to the Defendant, which could not have possibly informed his state of mind in the moments

-27-

leading to the shooting. The pattern jury instruction on self-defense, which was issued in this case, includes the following language:

> Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include, but are not limited, to any previous threats of the alleged victim made known to the defendant, the character of the alleged victim for violence when known to the defendant, the animosity of the alleged victim for the defendant as revealed to the defendant by previous acts and words of the alleged victim and the manner in which the parties were armed and their relative strengths and sizes.

Id. (emphasis added); see also Tenn. Code Ann. 39-11-611(b)(2) (stating, in relevant part, that a person acting lawfully and in a place the person has a right to be has no duty to retreat before using deadly force when "[t]he person has a reasonable belief that there is an imminent danger of death or serious bodily injury[.]").

We note that our supreme court has previously held that prior threats made by the victim, which were uncommunicated to the defendant, were admissible and relevant to prove that the victim was the aggressor. See, e.g., State v. Saylor, 117 S.W.3d 239, 248 (Tenn. 2003) (concluding that victim's statement to a third party on the day of his death that he would kill the defendant, a social acquaintance, was admissible and relevant to prove the victim's being the aggressor), holding modified on other grounds by State v. Turner, 305 S.W.3d 508 (Tenn. 2010); State v. Butler, 626 S.W.2d 6, 12 (Tenn. 1981) (holding that the victim's threat to "get rid of" the Defendant, her husband, while brandishing a pistol in front of a third party, was admissible to establish the victim's being the aggressor). The Butler court stated that "uncommunicated threats made by a deceased against a defendant are admissible . . . . However, the applicability of this rule is limited and it becomes operative only where relevant to explain the conduct of the deceased in establishing who was the aggressor." 626 S.W.2d at 12.

The facts of this case are distinguishable because the complained-of evidence did not establish that the victim, who was unknown to the Defendant, threatened the Defendant, the landfill workers, or any other individuals during the traffic stop or car chase. The evidence that the victim had a prior felony conviction and ran from police after having been a passenger in a car in which the driver acted violently toward law enforcement did not tend to establish that the victim was violent. Moreover, the Defendant's stated purpose for the evidence was not to establish the victim as the aggressor, but rather to prove that Defendant's fear of the victim was reasonable.

The trial court did not abuse its discretion by finding that the underlying facts of the car chase were irrelevant. We note that the most violent action the Defendant cites, the

aggravated assault, refers to the victim's stepfather's assaulting deputies with his car; the victim was not driving the car, and no evidence was presented to imply that the victim participated in the assault. In any event, no testimony indicated that the Defendant knew about the violent nature of the car chase or the victim's role in it, or lack thereof. The witness testimony generally established, and the Defendant confirmed, that the landfill employees were aware that a car chase had occurred and that the police were looking for a man in the woods near the landfill. They were also all informed that the man was believed to be armed with a long gun and pistol, and a SWAT team and helicopter patrolled the landfill during the manhunt. Although the police later became aware that the victim was unarmed, this fact was not communicated to most of the landfill employees before they returned to work. The jury was presented with ample facts, including the Defendant's testimony, to determine whether the threat he perceived was reasonable.

Similarly, the Defendant argues that the information was relevant to the victim's having committed a felony, which he was required to prove in order to justify a jury instruction on private arrest. We agree with the trial court that the evidence was not relevant to establish the Defendant's right to attempt a private arrest because it did not make it more or less likely that the Defendant knew about the victim's felon status. As we conclude below, it was plain from all the evidence at trial that the landfill employees were not informed about the victim's criminal history, making the private arrest instruction inapplicable. The trial court did not err by excluding the evidence, and the Defendant is not entitled to relief on this basis.

## IV. Prior Bad Act Evidence

The Defendant contends that the trial court erred by permitting the State to question him regarding his statement to Agent Carrier that he previously ran a suspected drunk driver off the road. The Defendant argues that the question's only purpose was "character assassination." The State responds that the question was properly allowed as impeachment evidence.

In a bench conference during the State's cross-examination of the Defendant, the State argued that in response to the Defendant's denying any intent to be a vigilante on direct examination, a portion of the Defendant's statement to Mr. Carrier was admissible under Rule 404(b) that he had previously "attempted to run what he perceived to be a drunk driver off the road" for law enforcement. During a subsequent jury-out hearing, the prosecutor stated that he sought to admit the evidence "[a]s impeachment . . . not as substantive evidence[.]"

The trial court found that the testimony was relevant to intent; however, the court noted, "[It] doesn't matter if it really happened. It's what [the Defendant] told [Mr. Carrier]. I think that goes to his intent, as well as impeaching his testimony here today."

The court further noted that it considered the evidence "more as impeachment rather than 404(b) evidence."

The trial court permitted the State to ask the Defendant a yes or no question regarding whether he previously "took action to run a drunk driver off the road" to assist the police and whether he communicated that fact to others. The court noted that it would issue a limiting instruction to safeguard the Defendant's rights.

The State's questioning occurred as follows:

Q. Once before you attempted to run a drunk driver off the road in order to assist Law Enforcement. Didn't you?
A. No, Sir.
Q. You got up behind it and you attempted what's called –

At this point, the Defendant objected, stating that he had already answered the question negatively. The trial court instructed the State to move on. The prosecutor continued,

Q. You didn't make contact – you didn't get up behind a vehicle and make contact with it at any time to run it off the road, because you believed they were drunk?
A. That's correct. I did not.
Q. But you did tell Agent Carrier that, didn't you?
A. The story that he got was misinterpreted. I don't believe --
Q. No. I'm sorry. You can answer yes or no -
A. Okay.
Q. -- and then you can explain. Yes, you told him that; or no you didn't?
A. No. I didn't tell him that.
Q. Okay. The story he got was what?
A. He was mistaken.

The trial court later noted for the record that it did not issue a limiting instruction because the Defendant denied engaging in the prior bad act.

The admission of evidence of other bad acts by the Defendant is governed by Tennessee Rule of Evidence 404(b). Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). To admit such evidence, the rule specifies four prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Id. When, the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. See State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005).

In this case, although a jury-out hearing was held and the trial court determined that the Defendant's reporting to Agent Carrier that he ran a drunk driver off the road was relevant to intent, the court did not find clear and convincing proof that the previous incident occurred or consider whether its probative value was outweighed by the danger of unfair prejudice. To the contrary, the court found that whether the incident occurred was immaterial because the evidence was offered for purposes of impeachment.

Although the Defendant does not discuss any other legal authority other than Rule 404(b) in his appellate brief and our consideration of it outside of this context would normally be waived, the discussion of impeachment and Rule 404(b) was sufficiently intertwined that it would be difficult for us to review the court's findings solely in a Rule 404(b) context. Further, the court appeared to base its findings on Rule 608(b) governing impeachment rather than Rule 404(b).

Tennessee Rule of Evidence Rule 608(b) provides that "specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness" may be inquired into on cross-examination if "the alleged conduct has probative value and . . . a reasonable factual basis exists for the inquiry." If the witness is the defendant, the State must provide "reasonable written notice" prior to trial of its intent to use the prior bad act as impeachment evidence and, upon request, the trial court must determine "that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Id. 608(b)(3). However, "after questioning a witness about prior bad acts, the defendant cannot prevent proper cross-examination." State v. Hutchison, 898 S.W.2d 161, 171 (Tenn. 1994) (citing State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)).

In this case, the record does not contain any Rule 608 notice from the State; however, the State asserted at trial that it only sought to question the Defendant in response to his statement on direct examination that he had no intent to act as a vigilante on the day of the shooting. Both the parties and the trial court proceeded under the Rule 404(b)

procedure of having a jury-out hearing, wherein the court found that the question was relevant to impeachment and the Defendant's intent. Relative to Rule 608(b), the court did not find that a reasonable factual basis existed for the inquiry or that the probative value outweighed any potential prejudicial effect.

Procedural murkiness notwithstanding, if any error occurred in the admission of this line of questioning, it was harmless. The Defendant's statement that he did not intend to act as a vigilante on the day of the shooting opened the door for the State to raise the Defendant's relaying the previous alleged vigilante incident to Agent Carrier a very short time after the shooting. See Tenn. R. Evid. 611(b)(c)(2) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility . . . [but is] limited to the subject matter of direct examination"). The State asked if the event occurred, and the Defendant denied it. The State then asked the Defendant whether he conveyed such a story to Agent Carrier, and the Defendant responded that Agent Carrier had a mistaken impression of an unspecified statement the Defendant made. Cross-examination continued without further discussion of the previous alleged vigilante incident. In the context of a lengthy cross-examination, the questions were brief, and no extrinsic evidence was introduced to belabor the point. We note that this evidence was most relevant to premeditation and the Defendant's intent and that the jury acquitted the Defendant of first-degree murder. The Defendant was not harmed by any error in this regard, and he is not entitled to relief on this basis.

## V. Jury Instructions

The Defendant contends that the trial court erred by issuing a jury instruction on transferred intent and by declining to give jury instructions on private arrest and defense of a business. Relative to transferred intent, the Defendant argues that the instruction only served to confuse the jury and that it was not fairly raised by the proof. The State responds that because the Defendant was unsure whether the victim was, in fact, the fugitive, the instruction was proper.

Relative to the private arrest instruction, the Defendant reiterates his previous argument regarding the car chase evidence, contending that he was prevented from establishing the victim's having committed a felony. The Defendant further argues that in rendering its decision not to include the instruction, the court improperly relied upon the Defendant's failure to physically engage with the victim.

Relative to defense of a business, the Defendant contends that the evidence supported the instruction because the landfill's employees routinely confronted trespassers; that Santek operated the landfill, in spite of its being owned by the county; and that "the mere fact that the [victim's] entry was unlawful can be viewed involving to at least some degree of force."

The State responds that the two latter issues have been waived because the Defendant did not cite to the page of the trial transcript in which he requested the instructions; in the alternative, the State argues that the jury was properly instructed.

As a preliminary matter, although the State correctly notes that the Defendant did not cite to the portion of the trial transcript in which he requested the special instructions, we are more concerned by the fact that in all three sub-issues, the Defendant neglected to cite to any legal authority regarding jury instructions or a standard of review for the trial court's findings. The Defendant recites the pattern jury instruction for transferred intent and defense of a business, as well as case law related to private arrest, but otherwise he provides this court no guidance on the authority upon which he wishes us to base our decision. See Tenn. R. App. P. 27(a)(7) (providing in relevant part that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . citation to authorities, or appropriate references to the record will be treated as waived in this court."). He has, therefore, waived plenary review of these issues.

Moreover, plain error relief is not warranted. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

In this case, the Defendant has not demonstrated that a clear and unequivocal rule of law was breached. A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id.

Relative to transferred intent, although the instruction is typically given in situations when a victim-bystander is harmed by a defendant's action toward a third party, we found at least one case where the doctrine was applied to a situation involving mistaken identity. See Batts v. State, 222 S.W.2d 190 (Tenn. 1946) (discussing that the defendant was guilty of first degree murder under a theory of transferred intent when he shot the victim, with whom he had no quarrel, believing the victim was another man). Regardless, even if the instruction was given in error, it would have been harmless. The instruction was an accurate statement of the law, even if its applicability was questionable, and it would not have misled the jury such that prejudicial error occurred. We note that the victim's being the Defendant's target was not in dispute; the Defendant admitted that he fired several warning shots before shooting at the victim's torso in order to stop him.

Relative to private arrest, as we concluded above, the car chase evidence was properly excluded as irrelevant to the Defendant's state of mind. No other evidence was introduced to indicate that the Defendant was aware of the victim's having committed a felony. The trial court also properly considered that by the Defendant's own account, the victim passed within one arm's length of the Defendant and that the Defendant took no action to arrest the victim. We note that the Defendant never stated an intent to arrest the victim, only to protect himself and his coworkers. The record supports the trial court's finding that the facts did not support a private arrest instruction.

Relative to defense of a business, the instruction required that the victim "unlawfully and forcibly" entered the landfill. Tenn. Code Ann. § 39-11-611(c); see 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010). "Force" is defined as "compulsion by the use of physical power or violence." Tenn. Code Ann. § 39-11-106(a)(14). The Defendant cites no authority to support his contention that unlawful entry constitutes force; we note that if this were the case, the statutory language "unlawfully and forcibly" would be redundant. "We . . . employ the rule of statutory construction in which we presume that 'every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent.'" State v. Smith, 436 S.W.3d 751, 763 (Tenn. 2014) (quoting State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009)).

In the light most favorable to the Defendant, the evidence at trial established that the unarmed victim ran from the site of the car crash through the woods and eventually emerged into the landfill. No evidence indicated that the property was fenced, that any "no trespassing" signs were posted, or that the area was otherwise closed off from foot traffic. Cf. State v. Clifton Williams, Jr. No. M2012-00902-CCA-R3CD, 2013 WL 3947122, at *13 (Tenn. Crim. App. July 30, 2013) (noting relative to defense of a residence that the

-34-

victims "may have may have unlawfully and forcibly" entered the defendant's front porch by "disregarding the 'No Trespassing' sign and brandishing weapons"). The landfill employees testified that although they routinely engaged with members of the public to inquire about their business at the landfill, the landfill was county property and open to the public. The Defendant has not demonstrated that a clear and unequivocal rule of law was violated by the trial court's finding that the victim did not forcibly enter the landfill and that the defense of a business jury instruction was not factually supported. The Defendant is not entitled to plain error relief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE